UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CLEVELAND NICHOLAS,

                           Petitioner,                      **MEMORANDUM AND ORDER**
  -against-                                                                  14-CV-5595 (RRM)

CHRISTOPHER MILLER,

                           Respondent.
-----------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

      Petitioner Cleveland Nicholas, proceeding *pro se*, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his August 18, 2010, conviction for robbery in the first degree as unconstitutional. For the reasons set forth below, Nicholas's petition for a writ of habeas corpus is denied and this action is dismissed.

## BACKGROUND

      On April 9, 2009, Roberto Greaves, a Panamanian immigrant, was shot in a Brooklyn barbershop by someone who, according to Greaves and two eyewitnesses, indicated that the shooting was retribution for events that occurred in Panama. Approximately five to ten minutes after the incident, Greaves called 911 and told the operator that someone he knew had shot him and stolen his chains. After police officers arrived, Greaves told them the perpetrator was "Cleveland" or "Qui Blanc."

      Later that day, Greaves identified a photograph of Nicholas. Nicholas was subsequently arrested and indicted on fifteen counts, including two counts each of robbery in the first degree (N.Y. Penal Law § 160.15(2) & (4)), assault in the second degree (N.Y. Penal Law § 120.05(2) & (6)), and criminal possession of a weapon in the third degree (N.Y. Penal Law § 265.02(1)); one count each of robbery in the second degree (N.Y. Penal Law § 160.10(2)(A)) and attempted

1

assault in the first degree (N.Y. Penal Law §§ 110 & 120.10(1)); and other lesser offenses.  On July 26, 2010, Nicholas went to trial on these charges before Justice James P. Sullivan and a jury.

### A. Motions *in Limine*

#### 1. The *Molineux* Application

Prior to trial, the People sought permission to introduce on their direct case evidence that Nicholas lured Greaves to a home in Panama, where Greaves was then robbed (hereinafter "Panama Incident").  According to the People, the Panama Incident occurred around 2006, after Nicholas called Greaves and asked him to come to a certain address.  (P. 25.)[1]  Because the two men were acquainted, Greaves agreed to go.  Upon arriving, Greaves was greeted by two of Nicholas's friends, who then proceeded to handcuff and rob him.  (P. 25.)  Believing Nicholas had set him up, Greaves filed a complaint against Nicholas with the Panamanian police.  (P. 26.)  Greaves subsequently left for the United States and did not know whether Panamanian authorities in fact convicted Nicholas.  (P. 26.)

The People sought to introduce evidence of the Panama Incident pursuant to *People v. Molineux*, 168 N.Y. 264 (1901), as proof of motive and identity, and to complete the narrative concerning the April 9, 2009, robbery and shooting.  The People argued in particular that the evidence explained the shooter's exclamation:  "This is for what you did to me in Panama."  (P. 26–27.)  The People argued that without the *Molineux* evidence, the jury would speculate as to the meaning of this exclamation.  (P. 43.)  The People also argued the evidence was important to establish that Greaves had "additional opportunities to observe" Nicholas.  (P. 27–28.)

---

[1] Numbers preceded by "P" denote pages in the Transcript of Pretrial Proceedings which occurred on July 26 and 27, 2010 (Doc. No. 9-1).

Defense counsel countered that Nicholas's alleged motive was "perfectly clear," since he was "charged with a robbery" and "not with executing a vendetta." (P. 29–30.) Additionally, the defense argued that admitting evidence of the Panama Incident would be more prejudicial than probative given the lack of concrete evidence surrounding the commission of the alleged 2006 robbery and Nicholas's prosecution in Panama. (P. 29, 59.)

The trial court initially ruled the People could inquire about numerous aspects of the Panama Incident, including the robbery, Nicholas's presence during the robbery, Greaves's complaint, and Nicholas's subsequent arrest. (P. 51.) However, after the People clarified that they believed Greaves never saw Nicholas during the commission of the robbery, (P. 56), the judge reconsidered and ruled the People could elicit only whether Greaves filed a complaint against Nicholas in Panama, and whether Greaves knew what happened after he filed the complaint. (P. 62.)

### 2. The 911 Tape

The People further sought to introduce a recording of Greaves's 911 call, alleging it was made "only five minutes" after the shooting. (P. 62–65.) The People acknowledged that the 911 call was hearsay but argued that it was admissible pursuant to the excited utterance and present sense impression exceptions. (P. 62–64.) After playing the tape, in which Greaves stated, "Oh, my God" or "Oh, my God, I'm shot" some twelve or thirteen times and moaned in pain throughout the call, the People argued that Greaves was "under the stress of the incident that's report[ed.]" (P. 63.) The People further argued that the statements in the 911 call were presumptively reliable because they were consistent with statements Greaves made to police after the incident in which he claimed to know his assailant. (P. 63–64.)

Defense counsel opposed the 911 call's admission on several grounds. First, the defense argued that five minutes was enough time for Greaves to think rationally, reflect, and act in his own self-interest. (P. 65–66.) Second, defense counsel argued that it was "unfair to be admitting prior consistent statement[s] to bolster the testimony of the witness," and that it "add[ed] nothing else to [Greave's] testimony." (P. 64.) Finally, the defense argued that the evidence of the 911 call was more prejudicial than probative. (P. 66–67.)

The trial court ruled the 911 call admissible under the excited utterance exception "even though five minutes are said to have elapsed." (P. 70.) Noting that Greaves was still in the location where he was shot and sounded "excited," the judge determined that under "all the facts and circumstances" and after weighing the 911 call's probative and prejudicial effects, the evidence "me[t] the test of excited utterance" and was not "unduly prejudicial." (P. 70–71.)

### B. The Trial

#### 1. The People's Case

The People called five witnesses at trial including Roberto Greaves, Rigoberto Velasquez Juarez ("Velasquez"), Juan Juarez Reyes ("Reyes"), and Detective Joseph Perry of the 70th Precinct. Greaves testified he was first introduced to Cleveland Nicholas between 1997 and 1998 at a Panamanian reunion in Brooklyn. (T. 11.)[2] At the time, Greaves did not know Nicholas's full name but knew him only as "Qui Blanc." (T. 10.) According to Greaves, "Cleveland is like what we would call that in English, but in Spanish we would call it Qui Blanc. It is the same." (T. 81–85.)

Greaves saw Nicholas socially around four times in 1997 but did not see him again until 2005, when he was visiting his girlfriend in Panama City, Panama. (T. 12, 14, 124–29.) There,

---

[2] Numbers preceded by "T" denote pages in the Transcript of the Trial Proceedings which occurred on July 28–30, 2010, and August 2–4, 2010 (Doc. Nos. 9-1, 9-2).

4

Greaves encountered Nicholas on the street and invited him back to his hotel.  (T. 13.)  After paying for drinks and socializing by the pool, Greaves agreed to give Nicholas money to eat.  (T. 13.)  Nicholas returned to Greaves's hotel every day for the next ten days and asked for small amounts of money, which Greaves agreed to lend him.  (T. 14–15.)  Greaves also gave Nicholas's girlfriend money to take her child to the doctor.  (T. 15–16.)

According to Greaves, Nicholas never repaid any of the money.  (T. 15–16.)  Greaves then filed a complaint against Nicholas with the Panama City police and was asked to come to the police station.  (T. 16–17.)  Greaves saw Nicholas in handcuffs at the police station, identified him, and left a few days later to return to the United States without speaking with the Panamanian police again.  (T. 17.)[3]

Greaves did not see Nicholas again for several years.  (T. 18.)  However, in 2009, Greaves encountered Nicholas at a restaurant in Brooklyn, whereupon Nicholas called him a "bitch."  (T. 18–19.)  Greaves, feeling uncomfortable, left the restaurant without engaging Nicholas.  (T. 19.)  A month later, he saw Nicholas at a Panamanian social club, where Nicholas again called him a "bitch" and stated, "We in America now."  (T. 19.)  Again, Greaves left the club before Nicholas said anything else to him.  (T. 20.)

Around 2:30 p.m. on April 9, 2009, Greaves went to Stanley "Larry" Hobson's house with the intent to wake Hobson, his barber, because he wanted a haircut.  (T. 20.)  Greaves testified he was not "great friends" with Hobson, who was "just his barber," but that he was

---

[3] During Greaves's testimony concerning the Panama Incident, Justice Sullivan gave the following limiting instruction: "The Court is allowing the People to ask this witness whether to the knowledge of this witness the defendant was arrested on a prior occasion in Panama.  The Court instructs you, the jury, that this evidence is offered solely for the purpose of background information and is not considered as proof of the crimes charged in this case nor is it to be considered for the purpose of proving that the defendant has a propensity or disposition to commit the crimes charged in this case."  (T. 16, 466.)  Defense did not object to this instruction, which was also repeated during the jury charge.  (T. 16, 466.)

friends with Hobson's mother. (T. 73–74.) Hobson and Greaves proceeded to walk together to the barbershop located at 66 Westminster Road in Brooklyn. (T. 21.) Upon entering, Greaves saw several people in the barbershop, one of whom he recognized as Jermaine "Chilly" Reid. (T. 22, 77.) He also saw Nicholas, known to him at the time as Qui Blanc, dressed in blue jeans and a white shirt, standing in the corner of the barbershop reading a newspaper. (T. 22–23.) Greaves sat down in the barber's chair to avoid Nicholas, who was "shaking his head" at him and "ma[king] a face." (T. 22–23.) While Greaves was getting his hair cut, Nicholas walked out of the barbershop and returned five to eight minutes later wearing a jean jacket and then stood in the same corner of the barbershop. (T. 23–24.)

Greaves noticed Nicholas was looking at his money while he paid Hobson for the haircut and turned his back toward Nicholas for privacy. (T. 24–25.) When Greaves went back to the chair to retrieve his soda, he "hear[d] a click behind [him]" and turned around to see Nicholas pointing a black gun at his chest. (T. 25.) Nicholas demanded Greaves's chains and money. (T. 26–27.) When Greaves refused, Nicholas punched and slapped him in the face, demanded that Greaves "give him everything," and threatened to "shoot [Greaves] in [his] head" if he did not. (T. 27.) Hobson attempted to intervene by stepping between Greaves and Nicholas, who told Hobson to move aside. (T. 29.) Nicholas then "ripped" the chains off Greaves's neck and continued to punch him. (T. 27.) As he beat Greaves, Nicholas said: "No, we in America. We not in Panama now. We are in America. You bitch, I told you now we in America." (T. 60–61.)

Nicholas then shot Greaves in the inner right thigh. (T. 30.) Greaves "fe[lt] the heat" in his leg and dropped to the ground where he lay in a pool of his own blood. (T. 30–33.) After Nicholas fled, Greaves waited for someone in the barbershop to call him an ambulance. (T. 35.) However, after about ten minutes, Greaves realized no one had called and dialed 911 himself.

6

(T. 36.) Greaves sensed that some of the barbers were trying to persuade him to move outside the barbershop, but he refused to lie about where he had been shot. (T. 36–38.)

Five minutes after Greaves placed the 911 call – which was introduced into evidence without objection and played for the jury – the police arrived. (T. 37–38.) Upon entering, the police asked Greaves if he knew the person who shot him, and Greaves responded, "Yes I know him." (T. 39.) Once he was in the ambulance, Greaves told police that "Qui Blanc" was the perpetrator. (T. 40.)

On cross-examination, the defense questioned Greaves about his relationship with Hobson, asking whether he had seen Hobson since the shooting. (T. 73–74.) Greaves testified that he had learned from Hobson's mother that Hobson moved to Georgia, but that he did not know when Hobson moved. (T. 73.) Greaves testified that Hobson "was just [his] barber," that he had spoken to Hobson only once after the shooting when visiting Hobson's mother, and that he had lost contact with him. (T. 73–74.)

Detective Joseph Perry testified that he arrived on the scene to find Greaves "on the floor screaming in agony." (T. 202.) The detective established a crime scene and canvassed the neighborhood but did not find the perpetrator or any additional evidence. (T. 203.) Later that day, Greaves identified a photograph of Nicholas as depicting the man who shot him. (T. 133.)

The next day, April 10, 2009, Detective Perry and officers of the 70th Precinct went to 409 Herzl Street looking for Nicholas. (T. 210.) Nicholas, who was on the street at the time and saw the police approaching, ran and hid in a closet in the residence's basement. (T. 210–11.) Detective Perry apprehended him there. (T. 211.) He arrested Nicholas and brought him to the 70th Precinct. (T. 212–13.) When asked for pedigree information, Nicholas stated he was born in Panama, was six feet tall, and weighed two hundred pounds. (T. 212–13.)

7

The People also called Velasquez and Reyes, who were in the barbershop at the time of the shooting, to testify. (T. 247, 260, 274.) Velasquez corroborated Greaves's testimony, stating: "The man who had the gun kept on arguing with [Greaves]. He said that he hadn't forgotten what he had done in Panama." (T. 253.) Velasquez further described the shooter, whom he did not know, as a "male of dark race," about five feet, ten inches tall and about one hundred seventy-five pounds. (T. 255, 263.) Reyes corroborated Greaves's testimony by stating the police arrived on the scene about ten minutes after Greaves was shot. (T. 285.)

Neither Velasquez nor Reyes could make an in-court identification of Nicholas. Velasquez testified he would not recognize the shooter if he saw him again because he was not able to "exactly [see] his face" during the shooting, which took place more than one-and-one-half years prior to trial. (T. 255.) Reyes testified he was afraid to look at the shooter's face during the commission of the crime. (T. 279.)

### 2. The Request for a Missing Witness Charge

After both sides rested, defense counsel requested a missing witness charge with respect to Officer Greg Markhov, one of the first officers to respond to the scene, and Stanley Hobson, Henry Israel, and Jermaine Reid – all barbers who were in the barbershop during the April 9, 2009, incident. (T. 330, 355–56.) Defense counsel argued that a missing witness charge was appropriate with respect to Hobson because he gave a statement to police, was well-acquainted with Greaves, could be expected to testify in favor of the People and adversely to the defense, and was under the People's control. (T. 332–33.) The People, however, denied that Hobson was under their control. Noting that Hobson had moved to Georgia and that Greaves had lost contact with him, the People represented that they were unable to locate him. (T. 339.) Further, the People argued that Hobson's testimony would be cumulative, stating that what Hobson

8

"witnessed [was] not any different from what the complaining witness testified about, what [Velasquez] testified about – what [Reyes] testified about." (T. 340.) The defense disputed that later point, arguing the testimony could not be cumulative because there were "major discrepancies" between the witnesses' and Greaves's testimony. As an example of the discrepancies, defense counsel noted that Greaves "never said he fell to the ground although Reyes and [Velasquez] . . . indicated that [Greaves] did fall to the ground." (T. 344.)

Justice Sullivan granted the missing witness request as to Officer Markhov, but denied the requests as to Reid, Israel, and Hobson. (T. 342–47.) The court opined that the testimony of the three barbers would be cumulative: consistent "in terms of the main event[,]" and merely corroborative of Greaves's testimony. (T. 346.) In addition, the judge was not persuaded the barbers were in the People's control. (T. 346.)

### 3. Summation

During his summation, defense counsel argued that Greaves's testimony regarding the Panama Incident was false. (T. 411.) However, he also pointed out that there was no proof that Nicholas was convicted, jailed, or otherwise punished. (T. 411.) He further argued that the Panama Incident was insufficiently grave to serve as a motive for the shooting. (T. 411.)

The People responded that Nicholas had a motive because Greaves "made a complaint against [Nicholas] in Panama," which caused Nicholas to be "locked up." (T. 446.) The People played the 911 call again and argued that Greaves was "desperate for help and trying to give information to 911, [and was therefore] focused on giving as accurate information as possible." (T. 427.) The People asserted that Greaves – having just been shot – was highly unlikely to fabricate a scheme within ten minutes of being shot that framed Nicholas and exonerated the real perpetrator. (T. 428.)

9

### 4. The Verdict and Sentence

During the charge conference, the People moved to dismiss ten of the fifteen counts charged in the indictment. (P. 311–19.) After Justice Sullivan also dismissed an eleventh count, only four counts remained: robbery in the first degree (N.Y. Penal Law § 160.15(2)), attempted assault in the first degree (N.Y. Penal Law §§ 110 & 120.10(1)), criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03(1)(B)), and assault in the second degree (N.Y. Penal Law § 120.05(2)). (P. 316–19.) Justice Sullivan stated that he would charge assault in the alternative. (P. 319.) However, when he actually charged the jury, he gave no such instruction.

On August 4, 2010, the jury returned its verdict, finding Nicholas guilty of robbery in the first degree. (T. 559.) For reasons which are unclear, the jury did not consider the remaining three counts. On August 18, 2010, the court sentenced Nicholas to sixteen years' imprisonment and five years' post-release supervision. (S. 16.)[4]

## C. The Direct Appeal

On appeal, Nicholas raised three issues. First, he argued that the trial court erroneously admitted Greaves's 911 call as an excited utterance. Second, he argued that the trial court violated his due process right to a fair trial by declining to submit a missing witness charge as to Hobson. Third, Nicholas claimed that trial court violated his due process right to a fair trial by admitting *Molineux* evidence regarding the Panama Incident.

On January 15, 2014, the Appellate Division unanimously affirmed Nicholas's conviction, rejecting all three of Nicholas's claims on the merits. *See People v. Nicholas*, 978 N.Y.S.2d 695, 695–96 (2d Dep't 2014). First, the Appellate Division held that the Supreme

---

[4] Numbers preceded by "S" denote pages in the Sentence Transcript (Doc. No. 9-2).

Court "properly admitted" Greaves's 911 call into evidence under the excited utterance exception. *Id.* Second, the Appellate Division held that the trial court's *Molineux* ruling was a "provident exercise of discretion" and that evidence of the Panama Incident established Nicholas's motive, completed the narrative, and was more probative than prejudicial. *Id.* The Appellate Division did not specifically address the missing witness charge issue, except to opine that Nicholas's "remaining contention [was] without merit." *Id.*

Nicholas sought leave to appeal all three issues to the New York Court of Appeals. However, on April 21, 2014, Chief Judge Pigott denied his leave application. *People v. Nicholas*, 22 N.Y.3d 1201 (2014). Nicholas did not seek a writ of certiorari in the United States Supreme Court.

### D. The Instant Petition

On September 22, 2014, Nicholas timely filed the instant petition for a writ of habeas corpus, raising the same three issues he raised on direct appeal. Respondent opposed the petition, arguing: (1) the trial court's admission of Greaves's 911 call as an excited utterance was proper, (2) the trial court did not violate Nicholas's due process right to a fair trial when it denied a missing witness charge for Hobson, and (3) Greaves's limited testimony about the prior complaint filed against Nicholas in Panama did not deny Nicholas his due process right to a fair trial.

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), "a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

11

> law, as determined by the Supreme Court of the United
> States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the State court proceeding.

28 U.S.C. § 2554.  "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)) (alteration in *Travis*).  A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413.  A decision is an "unreasonable application" of clearly established Federal law if a state court "identifies the correct governing legal principal from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

## DISCUSSION

### A. Evidentiary Errors

Because a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States," *Estelle v. McGuire*, 502 U.S. 62, 68 (1991), a habeas petitioner "must demonstrate that the allegedly-erroneous state court evidentiary ruling violated an identifiable constitutional right." *Allen v. Breslin*, No. 05-CV-1580 (ARR), 2005 WL 2591804, at *7 (E.D.N.Y. Oct. 13, 2005) (citing *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988)).  Thus, even if the evidentiary ruling was an erroneous application of state law, habeas relief is warranted "only where the petitioner 'can show that the error deprived [him] of a fundamentally fair* trial.'" *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) (quoting *Rosario*,

12

839 F.2d at 925). "The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) [*abrogated on other grounds*, *Perry v. New Hampshire*, 565 U.S. 228 (2012) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)].

"In making this due process determination, the Court should engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under New York State law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial." *Jones v. Rivera*, No. 06-CV-5982 (JFB), 2008 WL 2004168, at *4 (E.D.N.Y. May 7, 2008) (citing *Wade v. Mantello*, 333 F.3d 51, 59 n.7 (2d Cir. 2003)). If the petitioner cannot establish an evidentiary error or cannot establish that he was denied a fundamentally fair trial as a result of that evidentiary error, then habeas corpus relief cannot be granted. *See Barrett v. Ricks*, No. 00-CV-4636 (JBW), 2003 WL 22284164, at *8 (E.D.N.Y. Aug. 20, 2003).

### 1. The Admissibility of the 911 Call as an Excited Utterance

In his first argument, Nicholas principally argues that the trial court's admission of Greaves's 911 call as an excited utterance was erroneous because Greaves had time to reflect. "A 'spontaneous declaration or excited utterance – made contemporaneously or immediately after a startling event – which asserts the circumstances of that occasion as observed by the declarant' is an exception to the prohibition on hearsay." *People v. Cummings*, 31 N.Y.3d 204, 209 (2018) (quoting *People v. Edwards*, 47 N.Y.2d 493, 496–97 (1979)). "Although hearsay, excited utterances may be admissible because, 'as the impulsive and unreflecting responses of the declarant to the injury or other startling event, they possess a high degree of trustworthiness,

13

and, as thus expressing the real tenor of said declarant's belief as to the facts just observed by him, may be received as testimony of those facts.'" *Id.* (quoting *People v. Caviness*, 38 N.Y.2d 227, 231 (1975)) (emphasis in *Cummings* omitted).

"The decision to admit hearsay as an excited utterance is left to the sound judgment of the trial court . . . ." *People v. Hernandez*, 28 N.Y.3d 1056, 1057 (2016). While the New York Court of Appeals acknowledges that "the amount of time between the event and the statement" is a factor which the court "must consider," *id.*, it has "refuse[d] to adopt a rule that fixes an 'arbitrary limitation on the permissible period between the event and the excited utterance,'" *People v. Brooks*, 71 N.Y.2d 877, 879 (1988) (quoting *People v. Brown*, 70 N.Y.2d 513, 520 (1987)). As the Court of Appeals noted, "the time for reflection is not measured in minutes or seconds, but rather is measured by facts." *People v. Vasquez*, 88 N.Y.2d 561, 579 (1996) (internal quotation marks and citations omitted). Accordingly, a court "must assess 'not only the nature of the startling event and the amount of time which has elapsed between the occurrence and the statement, but also the activities of the declarant in the interim.'" *Id.* (quoting *Edwards*, 47 N.Y.2d at 497). "[T]he decisive factor is whether the surrounding circumstances reasonably justify the conclusion that the remarks were not made under the impetus of studied reflection." *Id.*

In this case, the undisputed facts justify Justice Sullivan's decision to admit the entirety of Greaves's 911 call as an excited utterance. As Nicholas's own appellate brief concedes, Greaves "crie[d] out in anguish and in pain" throughout the call, repeatedly stating, "Oh, my God," or "Oh, my God, I'm shot." (Appellant's Brief (Doc. No. 9-3) at 7.) Those exclamations of disbelief and excitement suggest that Greaves's statements during the 911 call were "impulsive and unreflecting responses." *Cummings*, 31 N.Y.3d at 209; *Caviness*, 38 N.Y.2d at

14

230–31. Indeed, Detective Perry's testimony that he arrived at the scene to find Greaves still "screaming in agony," (T. 32, 202), implies that Greaves was operating under the stress and excitement of the event even after the 911 call ended. *See People v. Shah*, 69 N.Y.S.3d 775, 777–78 (2d Dep't 2018) (finding 911 call admissible despite thirty minutes between assault and 911 call because complainant was breathing heavily, tenor of voice was agitated, and she was still operating under stress of excitement). The fact that some of Greaves's statements were in response to police questioning does not alter this conclusion. *See Edwards*, 47 N.Y.2d at 495–99 (finding victim did not have studied reflection even though declarations were made in response to questions posed by person coming to her aid).

Moreover, even if the trial court erred in admitting the 911 call, introduction of this evidence did not deprive Nicholas of a fair trial. The 911 call merely corroborated Greaves's testimony that he knew the shooter. However, Greaves's familiarity with Nicholas was amply established by Greaves's own testimony regarding his prior interactions with Nicholas. In addition, the fact that Greaves and Nicholas knew one another was corroborated by Velasquez's testimony that the shooter said "he hadn't forgotten what [Greaves] had done in Panama" before firing the shot.

### 2. The *Molineux* Claim

Next, Nicholas argues that he was deprived his right to a fair trial when the trial court allowed evidence of uncharged crimes to be introduced on the People's direct case. In New York, "[t]he general rule of evidence applicable to criminal trials is that the state cannot prove against a defendant any crime not alleged in the indictment, either as a foundation for a separate punishment, or as aiding the proofs that he is guilty of the crime charged." *Molineux*, 168 N.Y. at 291. While the exceptions to that rule "cannot be stated with categorical precision," generally:

15

> Evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial.

*Id.* at 293 (citation omitted).

The five categories listed in *Molineux* are "not exhaustive." *People v. Morris*, 21 N.Y.3d 588, 594 (2013) (citing *People v. Santarelli,* 49 N.Y.2d 241, 248 (1980)). Under New York law, a party may introduce evidence of uncharged crimes "to complete a witness'[s] narrative" and "to assist the jury in their comprehension of the crime." *People v. Steinberg*, 573 N.Y.S.2d 965, 979 (1st Dep't 1991) (quoting *People v. Mendez*, 564 N.Y.S.2d 241, 241 (1st Dep't 1990)) (alterations in *Steinberg*). Indeed, evidence "relevant to a pertinent issue in the case other than a defendant's criminal propensity to commit the crime charged" may be admissible. *People v. Till*, 87 N.Y.2d 835, 836 (1995). "[T]he extent to which such evidence may be received is a matter lying largely within the discretion of the trial court which must carefully weigh its probative value against the danger that it will unduly prejudice the defendant." *People v. Fay*, 444 N.Y.S.2d 629, 630 (1st Dep't 1981).

In this case, Greaves's testimony that he filed a criminal complaint against Nicholas in Panama was highly probative of Nicholas's motive. It was also probative of identity, because it established that the men were well-acquainted with one another. In addition, the *Molineux* evidence was crucial in completing the narrative. Greaves testified that on the several occasions when he ran into Nicholas in Brooklyn prior to the shooting and robbery, Nicholas would call him a "bitch" and state, "we in America now." (T. 18–19.) Greaves also testified, and Velasquez corroborated, that the man who shot and robbed Greaves stated, during the

16

commission of the crime, "No, we in America.  We not in Panama now.  We are in America," and "You bitch, I told you now we in America."  (T. 60–61, 253.)  Absent evidence of the Panama Incident, these comments would be unexplained.

While highly probative, the *Molineux* evidence was not very prejudicial.  The People did not adduce proof that Nicholas actually robbed Greaves in Panama or was convicted of a crime there.  Rather, the prosecution established only that Greaves had accused Nicholas of a crime, leading to his arrest by the Panamanian police.  This evidence was consistent with the theory that Greaves had falsely accused Nicholas, and that the false accusation had given rise to Nicholas's hatred of Greaves.  Moreover, whatever prejudice arose from the introduction of this evidence was limited by Justice Sullivan's instruction that the Panama evidence was "offered solely for the purpose for background information and [was] not to be considered for the purpose of proving that the defendant has a propensity or disposition to commit the crimes charged in this case."  (T. 16.)  In light of this limiting instruction, the prejudice of introducing the *Molineux* evidence was greatly outweighed by its probative value.

### B. The Missing Witness Charge

As another ground for habeas relief, Nicholas argues he was deprived his right to a fair trial when the trial court refused to give a missing witness charge with respect to Hobson.  However, Nicholas "can point to no clearly established Supreme Court precedent requiring a trial court to instruct the jury with respect to a missing witness," *Kirkby v. Filion*, 644 F. Supp. 2d 299, 307 (W.D.N.Y. 2009), because there is no such precedent.  *See Castro v. Fisher*, No. 04-CV-346 (DLC), 2004 WL 2525876, at *5 (S.D.N.Y. Nov. 8, 2004).  "A trial court's failure to give a missing witness instruction, like any other jury instruction, does not raise a constitutional issue and cannot serve as the basis for federal habeas relief unless the failure 'so infected the

17

entire trial that the resulting conviction violated due process.'" *Wright v. Marshall*, No. 05-CV-2280 (ARR), 2005 WL 1861633, at *4 (E.D.N.Y. Aug. 4, 2005) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

As with evidentiary errors, this Court must first consider the question of whether Justice Sullivan properly denied Nicholas's request for a missing witness charge. "The 'missing witness' instruction allows a jury to draw an unfavorable inference based on a party's failure to call a witness who would normally be expected to support that party's version of events." *People v. Smith*, No. 44, 2019 WL 2374228, at *2 (N.Y. June 6, 2019) (quoting *People v. Savinon*, 761 N.Y.S.2d 144, 146 (N.Y. 2003)). A missing witness charge is "appropriate when three conditions are met. 'First, the witness's knowledge must be material to the trial. Second, the witness must be expected to give noncumulative testimony favorable to the party against whom the charge is sought. Third, the witness must be available to that party.'" *Id.* (quoting *Savinon*, 761 N.Y.S.2d at 147).

In this case, the trial court properly denied the missing witness charge with respect to Hobson. First, there was no evidence that Hobson was under the People's control. Control exists "[w]here there is 'a relationship, in legal status or on the facts, as to make it natural to expect the party to have called the witness to testify in his favor'…." *Savinon*, 761 N.Y.S.2d at 150 (quoting *People v. Gonzalez*, 68 N.Y.2d 424, 429 (1986)). However, a witness's "casual friendship with the complainant" is insufficient to "place [him or her] within the People's 'control' for purposes of a missing witness charge." *People v. Brunson*, 707 N.Y.S.2d 1, 2 (1st Dep't 2000) (citing *People v. Justice*, 610 N.Y.S.2d 4, 5 (1st Dep't 1994)). Here, Greaves testified that Hobson was only his barber and "not a great friend." (T. 73–74.) This relationship,

18

which may not have even risen to the level of a "casual friendship," was insufficient to establish that Hobson was under the People's control.

Second, there was no evidence that Hobson was available. The People represented that Hobson had moved to Georgia, that Greaves had lost contact with him, and that the People were unable to locate him. The defense did not challenge the accuracy of these representations.

Third, Hobson's testimony would have been cumulative. The People introduced testimony from three eyewitnesses: Greaves, Velasquez, and Reyes. Although Greaves, as the victim, recalled the incident in more detail than the other two witnesses, Velasquez and Reyes corroborated portions of Greaves's testimony. There is no evidence to suggest that Hobson's testimony would have done more than provide further corroboration. Accordingly, the Court cannot find that the trial court erred in finding that Hobson's testimony would have been cumulative.

For these reasons, the Court concludes that the trial court properly refused to give a missing witness charge as to Hobson. However, even if such a missing witness charge had been warranted, the failure to give the charge would not have deprived Nicholas of a fair trial. In light of the ample evidence of Nicholas's guilt, there is no reason to believe that an adverse inference charge would have affected the jury's verdict.

## CONCLUSION

For the reasons set forth above, Nicholas's petition for a writ of habeas corpus is denied and this action is dismissed. A certificate of appealability shall not issue because Nicholas has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). The Clerk of Court is directed to enter judgment in accordance with this

Memorandum and Order, to mail a copy of the judgment and this Memorandum and Order to Nicholas, to note that mailing on the docket, and to close this case.

                                              SO ORDERED.

Dated: Brooklyn, New York                                 *Roslynn R. Mauskopf*
       September 30, 2019                                      _____
                                                      ROSLYNN R. MAUSKOPF
                                                      United States District Judge